Hamlen's Administrator *v.* Bennett.

---

## WILLIAM HAMLEN'S ADMINISTRATOR

*v.*

## JOHN C. BENNETT et al.

1. A wife who allows stock bought with her money to stand for several years in her husband's name, in order to give him credit, is estopped to assert her ownership as against his creditors.

Hamlen's Administrator *v.* Bennett.

2. One whose debtor has made an assignment for the benefit of creditors may, after neglect on the part of the assignee for eleven years to take proceedings to discover property belonging to the debtor, and having established his claim by judgment, institute such proceedings himself.

3. The fact that the creditor filed his claim with the assignee does not prevent him from instituting such proceeding.

4. Where a creditor of one who has made an assignment for the benefit of creditors, institutes proceedings for the discovery of assets and succeeds therein, it is proper to bring in the assignee as a party before making a final decree as to distribution of such newly-discovered assets.

On final hearing on pleadings and proofs.

*Mr. William M. Davis, Mr. George M. Shipman* and *Mr. William H. Morrow,* for the complainant.

*Mr. Charles F. Fitch* and *Mr. John R. Emery,* for the defendants.

Bird, V. C.

In this case a creditor asks that his judgment may be declared to be a lien upon certain real estate, the title to which he alleges was placed in the name of the wife of the debtor, at the instance of the debtor, for the purpose of protecting it from his creditors, and for the beneficial use and enjoyment of it against them. The answer to this is that the title was so placed at the instance of the wife, and that the property was paid for with her money. Does the testimony establish this? The effort is made to show that the wife was entitled to certain moneys as the next of kin of her father. This has been established. It is shown that so much of her father's estate as she was entitled to she received in the shape of bank stock, or afterwards had it converted into bank stock. There is no dispute but that this bank stock she still holds in her own name. It is manifest, therefore, that no part of this stock was used in the purchase of the real estate in question.

There is no satisfactory proof that Mrs. Bennett acquired any other estate whatsoever, except that which she may have received

from time to time from her husband. She insists that her husband, being the owner of considerable other real estate, made sales thereof from time to time, prior to the conveyance of the lot in question, and that upon the execution of the deeds for such conveyances he paid to her a part of the consideration. She swears, and he corroborates her, that upon one sale he gave to her $500, upon another $300, and upon many others from $5 upwards. No other amounts are specified. This is the very general way in which she received moneys on this account from her husband. He also engaged in a lottery venture from which he received $360, and he gave this to his wife, with which she purchased bank stock, on which she afterwards realized $700.

It is alleged that Mr. Bennett bought out a series of loans in a building and loan association, and that although he took the title thereto in his own name, it was for the benefit of Mrs. Bennett, and that she advanced money from time to time for the purpose of paying the dues which accrued thereon. A part of this building loan stock was not only in Mr. Bennett's name, but also in the name of Bennett & Beers, and a part in the name of some other person with him. It does not appear that Mrs. Bennett had any control whatever over this stock, or was in any manner recognized in the transaction by any of the parties interested, or that there was any written evidence of her interest therein given to her by her husband, or that she in any way or at any time asserted any claim or right thereto, prior to this controversy.

The general statement made by both Mr. and Mrs. Bennett respecting the payment of these moneys to her I think may be accepted as true. And that she paid moneys to him from time to time I believe. But the important question which I have the responsibility of deciding is not only how much money in all did he thus advance, or give to her, but also how much money she advanced, gave or loaned to him. And what is equally important for me to determine is how much she advanced or loaned to him for any particular purpose, especially for the purpose of procuring this building loan stock for herself, or for paying the

Hamlen's Administrator v. Bennett.

dues thereon, or for the purpose of taking the title to this real estate, or paying for the improvements thereon, after the purchase.

As there is nothing in writing to show what their transactions were, I find it impossible to determine how much money Mr. Bennett ever gave to Mrs. Bennett beyond the $500, $300 and $360. It is true they both agree that he gave her from $5 upwards for every lot that was sold. The whole number of lots sold was sixty-three. The very highest that I would be justified upon any principle in allowing on this account would be $5 per lot for sixty-one lots, or $305, the other two having been allowed for above. Were I to go beyond this, I would be determining civil rights in the region of merest speculation. I am aware that Mr. Bennett says that he was confident that he had given her from these various sources over $3,000, but courts cannot found their judgments upon testimony of this nature uncorroborated, when no accounts have been taken and when so many years, as in this case, have elapsed. I am unable, therefore, to find that Mr. Bennett gave to his wife over $1,465.

It should be remarked, in this connection, that during all the period which embraces these transactions, extending up to a time when Mr. Bennett made an assignment for the benefit of his creditors, which was three years after the conveyance to his wife in question, he was largely indebted.

But the second phase of the question above suggested presents still greater embarrassments, which the testimony in nowise removes. How much money did Mrs. Bennett advance to Mr. Bennett for the purchase of the building loan stock or the payment of the dues thereon, or for the purchase of the lot in question? They both swear that, from time to time, when he needed money he called upon her, and that she advanced it to him to pay for the stock. But, as in the former case, there is no written evidence whatsoever of the transactions between them. There is not a particle of evidence upon which I can, with any show of certainty, conclude how much money she advanced.

The court is bound to take notice of the observation of Mr. Bennett when under oath, that he took the title to this stock in his own name in order that he might have the benefit of the

credit which it would give to him. This is regarded as so strong a badge of fraud that courts never allow it to pass without expressing their disapprobation. It might be, if Mrs. Bennett had not known the fact that the title to this stock was taken in her husband's name, that she should not be held responsible, since in that case he would hold the property in trust for her, and his conduct would have been a fraud upon her. But there is every reason to believe that, if her story is true, she advanced money for the purchase of this stock and the payment of the dues thereon; that she had complete knowledge of the manner in which the stock was held. Allowing this condition of things to be created and to be continued for so many years, she must with him be held responsible therefor. Consenting as she did that her husband should have the benefit of the title to this property in his own name, she is now estopped from asserting her own ownership as against his creditors.

It will be seen that I have not found it necessary to resort to the views expressed by many learned judges, that in such cases the uncorroborated testimony of husband and wife should not be regarded as sufficient to defeat the claims of creditors. Taking the other testimony as true in all its length and breadth, the statements, except as I have above mentioned, are so general, but so indefinite and wanting in detail, that were they made by the most disinterested and unimpeached witnessess, they could not be made the basis of a decree as against creditors.

The impression sought to be created by the testimony was that whenever money passed from Mr. Bennett to Mrs. Bennett, it was a gift, but whenever it passed from Mrs. Bennett to Mr. Bennett, it was a loan. But if this were the true character of their dealings, they do not overcome the two conditions above expressed, viz., the fact that Mr. Bennett was all the while largely indebted, and the absolute uncertainty as to the amount of money which was so advanced.

Speaking of the important events in the order of their occurrence, one that demands attention was the purchase of the house and lot in question by John R. Bennett, the son of the defendants, Mr. and Mrs. John C. Bennett. This purchase was made

in the year 1878, about five years after the conveyance to Mrs. Bennett, and about three years after the assignment of Mr. Bennett for the benefit of creditors. It was made under the following circumstances: John R., then living in the city of New York, was sent for by his parents, then living in the house upon the premises in Phillipsburg. It appeared that a man by the name of Norton had a valid claim on this house and lot for between $500 and $600, and that the parents had no means of discharging this claim. The aid of the son was requested. The result was, he consented upon his part to pay the parents $7,500 for the property, to discharge this lien, giving them $500 in cash and a note for $7,000, and to take the title for the property in the name of his wife, Caroline, and to advance money, from time to time, to his parents as they should need it, for the support of the household, in discharge of the note, to the extent of such advances. Afterwards, and before the note was discharged, his mother was anxious that another son, Theodore, should be assisted in business, and prevailed upon John R. to loan his credit for that purpose. This John R. agreed to do, upon the understanding that, in case he should be obliged to make any payments on Theodore's account, they should be credited upon this note. It is in evidence that he was obliged to make several payments on his brother's account. It is also in evidence and undisputed that, from time to time after the execution of this deed, of conveyance to Caroline, and of this note to the mother, John R. made payments thereupon to his mother in accordance with their agreement at the time. It is also a part of the case that, in 1882, after Theodore had failed in the enterprise referred to, John R. was urged to purchase a farm, that Theodore might try his hand at farming for the benefit of his parents. John R. did purchase a farm, for which he paid $13,000. He stocked it also, and allowed his brother Theodore to take possession. That this farm was purchased by John R. for the benefit of his parents, admits of no doubt, but it is not clear, to my mind, to what extent this purchase or the value of the farm products were to be applied, if at all, to the $7,000 note. The extent of the payments made by John R., in

liquidation of the said note, will be a proper subject for future consideration, in case John has any rights of priority over judgment creditors.

I think John R. was, to the extent of moneys actually paid, a *bona fide* purchaser. It will be seen that the conveyance was made to Mrs. Bennett in 1873. Her husband, the judgment debtor, made an assignment in 1876. The debt upon which this judgment was founded was of long standing—prior to the execution of the conveyance to Mrs. Bennett. John R., the son, took the title from his parents in 1878, two years after the assignment was made by his father for the benefit of creditors. John swears that he never, at any time, had any knowledge whatsoever of the existence of this judgment, or of any other claim upon this property than the one which he discharged, or of any supposed fraudulent transaction upon the part of his parents, until after the filing of the bill in this case. This bill was not filed until the 30th day of July, 1887. There can be no doubt but that, under the circumstances, John R. is entitled to the full benefit of all the payments actually made upon the account of such purchase. The amount of these payments will be ascertained; when so ascertained they will be adjudged to be a first lien upon the premises, subject to which a sale will be advised.

Upon the argument of the case, the right of the complainant to file his bill was earnestly resisted. Under the authority of *Pillsbury* v. *Kingon, 6 Stew. Eq. 287*, it is very apparent that the rights and interests of an assignor passed to the assignee, and that in case the assignor has fraudulently conveyed or concealed any of his property or assets, it may be pursued and recovered by the assignee. But it does not follow, I think, that because the title passes to the assignee and because he may bring suit for the recovery thereof, that a creditor may not, under some circumstances, take upon himself the burden of proceeding for such recovery. For example, many years, as in this case, of neglect upon the part of the assignee to proceed, or in case there may be serious doubt as to whether creditors are entitled to any benefit from the property alleged to be fraudulently conveyed or concealed, if the creditor is willing to take the risk of

Hamlen's Administrator *v.* Bennett.

the burden upon himself, having established his claim by judgment, I can see no good reason why he should not be permitted to do so. Nor do I think that this view is at all in conflict with the authorities. Indeed, it seems to me to be wholly within the true spirit and meaning of the act when it declares that a creditor who has not filed his claim shall not be permitted to participate in the division made by the assignee unless he shall discover other property of the debtor. See Assignment act, §§ 20, 21 (*Rev. p. 40*). From the language of the act, the only reasonable construction, it seems to me, is that the work of discovery devolves upon the creditor.

But it is claimed that the complainant's intestate in this case filed his claim with the assignee and afterwards withdrew it. I find that these allegations are true. I find, also, that when he filed that claim he subjected himself to all the consequences of a creditor filing a claim. He elected, as the statute permits him to do, what course he would pursue—whether he would file his claim and take a ratable proportion with the other creditors who filed their claims, and, under the statute, forego all the balance, or whether he would decline to participate in the provisions of the statute. In my judgment he was bound by that act, but the utmost consequences of that are the diminution of his claim according to the proportion declared to be paid. He is not bound beyond that. Certainly, no creditor who filed his claim would be deprived of privileges which were extended to creditors who had not filed their claims, with respect to property which, either in law or equity, the assignee was entitled to and by proper proceedings could have recovered. The statute never intended to let in a creditor who had not filed his claim, but who afterwards discovered property of the debtor, to enjoy the benefit of that discovery and to deprive creditors who filed their claims of the right of making such discovery, subjecting the rights of the latter wholly upon the willingness of the former to make the discovery. It seems to me that this is within the true reason and spirit of the law.

But, the discovery being made and property of the debtor being found for distribution, it is not for the complainant, in

a case like the present, to absorb it all in satisfaction of his judgment. It belongs to the assignee, who is authorized by the statute to make distribution thereof. This being so, the assignee is a necessary party; he should be before the court in that capacity. The court cannot make a final decree until he is brought in. Because of his absence, it has been urged that the bill should be dismissed. This would be a harsh and wholly useless proceeding. The testimony seems to have been so fully presented that, in case of a new trial upon another bill, it would be quite impossible for the assignee to change the aspect of the case. Let the assignee be brought in.